UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Kimberly Morrow,

      Plaintiff,

v.                                                    Honorable Sean F. Cox

L & L Products, Inc.,                        Case No. 11-15589

      Defendant.

_____/

**OPINION & ORDER**
**GRANTING IN PART AND DENYING IN PART**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Kimberly Morrow ("Morrow" or "Plaintiff") filed this action against her former employer, L & L Products, Inc. ("L & L" or "Defendant"), asserting claims regarding alleged unequal wages under the Equal Pay Act and Title VII, and asserting gender discrimination and retaliation claims under Title VII.  The case is currently before the Court on Defendant's Motion for Summary Judgment.  The parties have briefed the issues and the Court heard oral argument on May 10, 2013.

As to Plaintiff's Equal Pay Act claims, Defendant challenges Plaintiff's ability to establish a prima facie case based on a test set forth by the Eighth and Ninth Circuits.  The United States Court of Appeals for the Sixth Circuit, however, has not adopted that test.  Plaintiff can establish a prima facie case under the governing law and this Court must therefore decide if Defendant has sufficiently established the affirmative defense of any wage differential being the result of a seniority system (as opposed to being due to gender) such that no reasonable jury could find otherwise.  The Court concludes that Defendant has done so and shall grant

1

summary judgment in favor of Defendant as to Plaintiff's wage claims.

As explained below, Defendant filed its motion believing that Plaintiff was pursuing "single-motive" Title VII claims and its motion therefore analyzes her claims under the *McDonnell Douglas* burden shifting framework.  In responding to the motion, however, Plaintiff now affirmatively asserts that she is pursuing her Title VII claims as "mixed-motive" claims.  That is significant because the *McDonnell Douglas* burden shifting framework does not apply to such claims.  Rather, a more lenient standard applies to those claims.  Applying that more lenient standard, the Court concludes that Plaintiff's Title VII gender discrimination and retaliation claims must proceed to a jury trial.  The Court shall deny Defendant's Motion for Summary Judgment as to those claims.

## BACKGROUND

Plaintiff filed this action against L & L on December 21, 2011, asserting the following claims:   1) Title VII Sex/Gender Discrimination (Count I); 2) Title VII Opposition and/or Retaliation; and 3) a claim under the Equal Pay Act (Count III).

Following the close of discovery, Defendant filed the instant Motion for Summary Judgment.  This Court's practice guidelines are included in the Scheduling Order and provide, consistent with Fed. R. Civ. P. 56 (c) and (e), that:

> a. The moving party's papers shall include a separate document entitled Statement of Material Facts Not in Dispute.  The statement shall list in separately numbered paragraphs concise statements of each undisputed material fact, supported by appropriate citations to the record. . .
>
> b. In response, the opposing party shall file a separate document entitled Counter-Statement of Disputed Facts.  The counter-statement shall list in separately numbered paragraphs following the order or the movant's statement, whether each of the facts asserted by the moving party is admitted or denied and

2

shall also be supported by appropriate citations to the record.  The Counter-Statement shall also include, in a separate section, a list of each issue of material fact as to which it is contended there is a genuine issue for trial.

c.  All material facts as set forth in the Statement of Material Facts Not in Dispute shall be deemed admitted unless controverted in the Counter-Statement of Disputed Facts.

(Docket Entry No. 30 at 2-3).   Defendant complied with the Court's practice guidelines for motions for summary judgment such that its motion includes a "Statement of Material Facts Not In Dispute" (Docket Entry No. 19 at Pg ID 126-133, "Def.'s "Stmt.").  Plaintiff's response brief includes a "Counter-Statement of Disputed Facts" (Docket Entry No. 23 at Pg ID 423-435, "Pl.'s Stmt.").

The following material facts are gleaned from the evidence submitted by the parties, taken in the light most favorable to Plaintiff, the nonmoving party.

L & L is a manufacturer of parts and chemical compounds that are used for structural reinforcement and the creation of composite components in automotive, aerospace, commercial vehicle and other industrial applications.  (Def.'s Stmt. at ¶ 1; Pl.'s Stmt. at ¶ 1).

During Plaintiff's employment at L & L, the company had separate wage scales for the seven different manufacturing department positions.  (Lewallen[1] Decl.).  The entry level position was called Production Technician.  (*Id.*).  Above that, there were six "upper level" positions:  1) Shipping and Receiving; 2) Twin Screw Support; 3) Mixing Technician; 4) Material Handler; 5) Set-Up; and 6) Group Leader.  (*Id.*).

Persons employed in the entry level position of Production Technician were eligible for

---

[1]Shelly Lewallen ("Lewallen") was L & L's Human Resources Director at all relevant times.

cost of living allowance ("COLA") increases (expressed as a percentage of current wage) but not for merit increases.  (Def.'s Stmt. at ¶ 15; Pl.'s Stmt. at ¶ 15).  Upper level positions had a higher starting wage and persons employed in those positions were eligible for merit increases in addition to COLA increases.  (Lewallen Decl.).

Plaintiff began working at L & L as a Production Technician earning $8.75 per hour on July 19, 1993.  (Def.'s Stmt. at ¶ 2; Pl.'s Stmt. at ¶ 2).

By October 24, 2005, when Plaintiff began working as a Material Handler (her first time being assigned to an Upper-Level Position on something other than a temporary basis) the starting wage for that position was $15.69.  (Def.'s Stmt. at ¶ 17; Pl.'s Stmt. at ¶ 17).

Plaintiff began working in a Twin Screw Support position in January of 2011.  (*See* Def.'s Exs. 3 & 7).  As a Twin Screw Support employee, Plaintiff was responsible for setting up, shutting down, and changing over the twin screw extrusion line, and making sure that those machines were provided with all necessary material.  (Def.'s Stmt. at ¶ 5; Pl.'s Stmt. at ¶ 5).

On January 24, 2011, Plaintiff met with Debbie Hutchison ("Hutchison"), an Employee Relations Specialist at L & L, to complain that she had seen the paycheck of one of her male co-workers and that his check was larger, despite the fact that he had worked fewer hours than she had in the preceding pay period.  (Def.'s Stmt. at ¶ 6; Pl.'s Stmt. at ¶ 6).  Hutchison told Plaintiff that while she did not have specific details, there may be reasons why Plaintiff was being paid a different hourly rate than another employee in the same position.  (Pl.'s Dep. at 122-26).  Hutchison told Plaintiff that she would look into it and get back to Her.  (*Id*. at 126).  Specifically, Hutchison promised to discuss Plaintiff's question with Butch VanConant ("Van Conant"), L & L's Manufacturing Manager, to determine the reason for the difference in

compensation.  (Def.'s Stmt. at ¶ 8; Pl.'s Stmt. at ¶ 8).

Hutchison contacted VanConant and asked him to look into Plaintiff's question and communicate directly with her regarding the reasons for the differential in wage.  (Def.'s Stmt. at ¶ 9; Pl.'s Stmt. at ¶ 9).  When Hutchison followed up with her, Plaintiff confirmed that VanConant had discussed the wage question with her and she understood how the wage differential came to be.  (Def.'s Stmt. at ¶ 10; Pl.'s Stmt. at ¶ 10).

On February 7, 2011, Plaintiff filed a Charge of Discrimination, alleging that she was discriminated against on the basis of her gender on January 27, 2011.  (Ex. 7 to Def.'s Br.).  In that charge, Plaintiff alleged:

> I am a woman and believe I was paid unequal wages, most recently on J[anuary] 27, 2011, because of my sex.
>
> I was hired on July 19, 1993, and currently work as a twin support technician.
>
> **Unequal wages               01/27/2011      Sex**
>
> I am the only woman of 13 employees in the same job.  The job was created six years ago and the respondent created a salary range.  I have the same or better credentials than the men holding the same position, yet I make less than a man with less seniority, most recently on January 27, 2011.  I have complained to the respondent about this difference but nothing was done.  I believe I was paid unequal wages because of my sex.
>
> This complaint is based on the following law:
>
> Elliott-Larsen Civil Rights Act No 453, Public Act of 1976, as amended
> Title VII, US Civil Rights Act of 1964, as amended

(*Id.*) (bolding in original).

On June 6, 2011, Plaintiff was working in Twin Screw Support when one of the machines for which she was responsible began running out of a raw material.  Refilling that machine

required Plaintiff to move a fifty pound bag of chemicals from the floor onto a twelve foot high

working deck.  (Def.'s Stmt. at ¶ 25; Pl.'s Stmt. at ¶ 25).  Plaintiff testified that she walked down

the stairs and got the bag of chemicals that she needed for her machine.  (Morrow Dep. at 143).

She put the bag up to the deck where the bag caught on a piece of metal that was bent and tore it.

(*Id.*).  Plaintiff further testified:

> At that time Dale Nellenbach started his shift because he was afternoons. And he
> come to help me figure out what to do with this bag that was stuck on this piece
> of metal.  So he – we decided that he would stay down on the hi-lo, and I would
> run up on the deck and get the bag off of the hi-lo fork and put it on my twin
> deck. And that once I did that, I finished running – or mixing my material and ran
> the machine.

(Morrow Dep. at 143-44).  At this time, an engineer named Steve Balsam ("Balsam") was in the

area and witnessed the actions of Plaintiff and Dale Nellenbach ("Nellenbach").  (Morrow Dep.

at 146-47; Morrow Affidavit at ¶ 11).  After Plaintiff and Nellenbach had finished the task,

Balsam walked up to Plaintiff and spoke to her:

> A.    He come up and he explained to me, "You know that you're not supposed
>        to be doing that, that it's unsafe for you to do that."
>        I – I told him I understood.  I made a judgment error.  At the time, I was
> concerned with keeping my machine going and getting that bag off of there
> because it was leaking.  And that is also dangerous, for it to be leaking on the
> floor for someone to slip.  So I was trying to fix that.

(Morrow Dep. at 147).

Balsam testified that he spoke to Nellenbach regarding the above incident.  Balsam

testified:

> Q.    Okay.  You talked with Dale Nellenbach and Gary Martin about this
>        incident, correct?
> A.    I know I spoke to Dale.
> Q.    Okay.

A.    Gary? I don't recall if I spoke to Gary that day.

Q.    Okay.  When you spoke to Dale, was it the same day?

A.    Yes.

Q.    Did you ask him, "What are you doing on the hi-lo?"

A.    No. He told me what he was doing.  I asked him what he was doing, and he told me that he –

Q.    Oh, okay.  Well, tell us – tell us that conversation.

A.    He told me that he had – that Kim had asked for assistance, and he was helping to get the forks and bring the hi-lo down.

Q.    Okay.  Is there any other part of the conversation other than that you talked with Dale?

A.    You know, I – I did tell him that, you know, "This is kind of – We're bypassing a safety gate."  I told him, "We shouldn't be doing this.  Thanks for helping out."

Q.    And what did he say?

A.    He agreed that shouldn't have been done.

(Balsam Dep. at 17-18).

After the incident, Balsam sent an e-mail to VanConant and Jim Hurd ("Hurd") and about the June 16, 2011, incident.  (Ex. 10 to Def.'s Br.).  That e-mail advised about the incident, and that Balsam had spoken to Plaintiff about the incident, but did not mention any involvement of Nellenbach.  (*Id*.).

On June 16, 2011, Plaintiff met with Hurd and Hutchison.  Plaintiff was told that she was being suspended for three days for a safety violation.  (Morrow Dep. at 154).  After that meeting, Hurd issued a Memo to Plaintiff, explaining that she was being suspended for three days as a result of the safety violation on June 6, 2011.  (Def.'s Ex. 13).  That letter stated, in pertinent part:

Kim, on Monday June 6, 2011, you were seen attempting to move a bag of chemicals from the forks of the hilo on top of the weigh up deck, TW07.  You were also seen reaching over to retrieve the bag of chemical from the forks with the safety gate not in the proper place to protect yourself from falling off the deck.  Proper procedure would have been to place the chemical on a skid and placed

7

skid on top of deck.  To retrieve the chemical you would have had to go up on the deck and place the safety gate to the outside of the deck to protect yourself from falling off the deck.  And follow proper lifting procedure.

On Friday, June 9, 2011, we had a discussion with Debbie Hutchison about you not following the proper procedure of loading and unloading chemicals on the deck and bypassing a safety device.  You showed us that you loaded a bag of chemicals onto the forks of the hilo and it was leaking.  So you went onto the deck, got into a green bin, moved the safety gate so that it was not protecting you from falling over the edge.  You reached over the edge of the deck to retrieve the bag of leaking chemicals and placed it into the green bin.  You stated that you knew it was wrong, but they were running out of that particular chemical.
Kim, L & L Products believes that a safe work environment is a basic necessity in our efforts to be a good employer.  It is our corporate conviction that no phase of our Company's business is of greater importance than the safety of our employees. . . . .

We spoke with Kim Morrow on Thursday, June 16, 2011, in regards to her unsafe behavior/practice.  She was informed that her unsafe behavior was unacceptable and requires immediate improvement.  We also explained to her that she is being suspended without pay for 3 days beginning on Thursday, June 16, 2011, Friday, June 17, 2011, and Monday, June 20, 2011.  I asked Kim to bring a commitment letter with her when she returns on Tuesday, June 21, 2011, indicating how she intends on improving her commitment to Safety and Safe Behaviors.

Kim, failure to follow procedures is totally unacceptable.  Any further incidence will result in termination of your employment with L & L Products.

If you would like to discuss this memo with your Employee Relations Manager, please contact Debbie Hutchison at extension 1637.  Please sign below to indicate that you have received this memo and understand the company's expectations.

(Def.'s Ex. 13).

Plaintiff submitted, as her safety commitment letter to L & L, a letter dated June 16,

2011, that states as follows:

This letter is being written in response to a request by the company L & L Products following my 3 day suspension for an unsafe act.  Upon my return to work I fully intend to follow all safety policies and procedures.  I will also alert

8

the company of any future unsafe practices or conditions that I witness.

        Although I understand I performed an unsafe act which did not result in anyone's personal injury, I feel the discipline was severe. I was talked to on three different occasions regarding this matter. I feel that other safety issues I have witnessed in the past such as Gary Martin and Dale Nellenbach cutting themselves on the pelletzer blades on two separate occasions were much more severe. Gary Martin was actually sent to the clinic after being cut and had to fill out an accident report. Neither employee was suspended.

        I am concerned that this discipline is not only a direct result of any unsafe act but also a retaliation against me by L & L Products for filing a complaint of discrimination against them with the Michigan Department of Civil Rights and the EEOC.

(Ex. 14 to Def.'s Br.).

Plaintiff testified that she spoke with VanConant again on June 21, 2011, or June 22, 2011. (Morrow Dep. at 182-84). She testified:

A.    I believe he – he told me to – as far as he was concerned, just that the top – or the second and third paragraph needed – exact words, I – I can't remember exact word for word some of this conversation, but that them needed to come out. And as far as he was concerned, if I did that, I could come back to work. And it was – it had to be that day.

Q.    Okay. Did you do it?

A.    No.

Q.    Why not?

A.    Because I believed what I wrote in my letter was – I wrote what they asked me to. It was the truth, and it was what was right. And I wasn't going to change that.

(Morrow Dep. at 183-84). After that conversation, Plaintiff left Hutchison a voicemail message stating that she would not re-write the commitment letter and asking what would happen next. (Morrow Dep. at 185-86). Shortly after Plaintiff left that message, VanConant, Hurd, and Hutchison told Plaintiff that she would continue on unpaid suspension until she re-wrote the commitment letter. (Morrow Dep. at 187-90).

Thereafter, Lewallen sent Plaintiff a letter dated June 27, 2011 (Def.'s Ex. 18), that stated

as follows:

> Per our conversation on June 24, 2011, I am writing to acknowledge receipt of your June 16, 2011 commitment letter.
>
> As part of your suspension, you were asked to write a commitment letter indicating how you intend to improve your commitment to Safety and Safe Behaviors.  If an employee returns without a commitment letter or a commitment letter that does not meet our standards, the employee is sent home and asked to amend their letter.
>
> Kim, we did not feel your letter took responsibility for your actions, nor did it outline the steps and actions you would take to make sure this behavior does not happen again.
>
> We are asking you to amend your commitment letter to acknowledge what safety steps you did not follow and what steps you will take to prevent another unsafe act from happening.  We would like to set up a meeting on Tuesday, June 28, 2011 with Butch VanConant and Debbie Hutchison to review your amended commitment letter.
>
> L & L Products takes employee safety issues very seriously.  Your recent safety violation is a serious matter and could have caused injury to you and your co-workers.  Your discipline was in no way related to any issue other than your violation of L & L safety policy and we regret that you feel otherwise.  Please contact me if you have questions.

(Def.'s Ex. 18).

On June 27, 2011, Plaintiff sent Lewallen an e-mail, on which she copied VanConant and Hutchison, stating:  "As I have stated several times already, I wrote the commitment letter as requested. I totally understand what I did and what was/is expected of me therefore, I will not amend my commitment letter in any way."  (Def.'s Ex. 19).

After yet another meeting to discuss the commitment letter, VanConant sent Plaintiff a letter dated June 30, 2011, that advised Plaintiff that if he did not receive her "amended commitment letter by 12:00 p.m. on Friday, July 1, 2011, you will voluntary resign your

employment with L & L Products will be terminated [sic]." (Ex. 20 to Def.'s Br.) (underlining in original).

Plaintiff did not submit an amended commitment letter and L & L terminated Plaintiff's employment effective July 1, 2011. At the time that her employment ended, Plaintiff was working in Twin Screw Support, earning $17.25 per hour. (Def.'s Stmt. at ¶ 4; Pl.'s Stmt. at ¶ 4).

On July 6, 2011, Plaintiff filed another Charge of Discrimination, this time alleging discrimination based upon retaliation and gender. (Ex. 21 to Def.'s Br.). In that charge, Plaintiff alleged:

> I am a woman and believe I was disciplined June 16, 2011, and subsequently discharged on July 1, 2011, in retaliation for filing MDCR complaint #421743, because of my sex.
> I was hired on July 19, 1993, and last worked as a twin support technician.
>
> **Discipline                     06/16/2011      Sex, Retaliation**
>
> On June 16, 2011, I was issued a three-day suspension for violating safety regulations. My return to work was also contingent upon my writing a commitment letter. However, when I submitted the letter, Respondent's male representative refused it because I mentioned the suspension as well as the commitment letter were in retaliation for a previously filed civil rights complaint. I know of male employees who violated similar safety regulations, and were not suspended or obligated to submit a letter of commitment.
>
> **Discharge                      07/01/2011      Retaliation, Sex**
>
> On July 1, 2011, Respondent's male representative discharged me for refusing to omit information from a commitment letter I was required to write as a condition to return to work following a three-day suspension. I believe Respondent's male representative is predisposed to discriminate against me because of my sex, and in retaliation for filing a previous civil rights complaint.
>
> This complaint is based on the following law:

Elliott-Larsen Civil Rights Act No, 453, Public Act of 1976, as amended
Title VII, US Civil Rights Act of 1964, as amended.

(*Id*.) (bolding in original).

During discovery, Lewallen testified regarding an incident with a female employee

named Brenda Hurst ("Hurst"):

A. This was a safety incident.
Q. Okay, do you know if she was suspended?
A. I do not think that she was suspended.
Q. Okay. But, I mean, is this the type – same type of category of safety incident like Kim Morrow's?
A. This would be a safety incident.
Q. Okay, safety incident.
Any idea why she wasn't suspended? Do you have any idea?
A. I did not do the investigation, so my guess would be this was an accident, not an act of not using.
Q. Okay. And she didn't have to write any safety commitment letter before she came – in connection with this incident, correct?
A. Not that I'm aware of.

(Lewallen Dep. at 74-75). Lewallen further testified that Hurst had not filed any complaints with

the Michigan Department of Civil Rights or the EEOC. (*Id*. at 77).

## ANALYSIS

**I.    Which Claims May Plaintiff Pursue In This Action?**

Defendant's Motion for Summary Judgment raises multiple issues and grounds for relief.

It raises, as the first issue, the following:

Whether Morrow's claims i[n] this lawsuit are limited to a claim for wage discrimination in violation of the Equal Pay Act and Title VII, a claim for retaliation and gender discrimination arising from her suspension on June 16, 2011, and a claim for retaliation and gender discrimination arising from her resignation on July 1, 2011 where the two EEOC charges she filed were limited to those three claims.

12

(Def.'s Br. at iii).  Defendant's brief then discusses this issue at pages 8-9.  Defendant states that, during her deposition in this case, Plaintiff raised several new allegations of gender-based harassment and retaliatory harassment for the first time.  Defendant contends that because such allegations were never the basis for an EEOC charge, they are not actionable in this case.  Defendant asks the Court to rule that only Plaintiff's allegations of illegal treatment related to disparate pay, her suspension, and her termination were preserved through proper exhaustion of administrative remedies.

Plaintiff's response brief does not respond to this ground for relief or indicate that Plaintiff is seeking to pursue any claims other than those claims relating to her wages, her suspension, and her termination.

The Court therefore concludes that the only claims that Plaintiff may raise in this action are those claims relating to her wages, her suspension, and her termination.

## II.    Plaintiff's Claims Under The Equal Pay Act

The Equal Pay Act ("EPA") prohibits employers from paying an employee at a rate less than that paid to employees of the opposite sex for equal work.  29 U.S.C. § 206(d)(1).  "To prove an employer has violated the Equal Pay Act, a plaintiff must show that the employer paid an employee of the opposite sex different wages 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'" *Warf v. U.S. Dept. of Veterans Affairs*, __ F.3d __, 2013 WL 1458702 (6th Cir. 2013) (quoting *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974)).  "'Equal work' does not require the jobs to be identical." *Id*. (Citing *Beck-Wilson v. Principi*, 441 F.3d 353, 359-60 (6th Cir. 2006)).

13

"Once a plaintiff has proven her prima facie case, the burden shifts back to the defendant to provide one of four affirmative defenses: '(1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) any other factor other than sex.'" *Warf, supra* (quoting *Buntin v. Breathitt Cnty. Bd. of Educ.*, 134 F.3d 796, 799 (6th Cir. 1998)).

In its motion, Defendant contends that Plaintiff cannot establish a prima facie case and that, even if she could, she cannot overcome that a factor other than sex led to any alleged pay disparity.

### A.      Can Plaintiff Establish A Prima Facie Case?

To establish a prima facie case of wage discrimination under the EPA, the plaintiff must demonstrate that an employer pays different wages to employees of opposite sexes for equal work.  *Vehar v. Cole Nat. Group, Inc*., 151 Fed. App'x 993, 2007 WL 3129713 (6th Cir. 2007). Thus, you look at whether the work was the same and, if so, whether employees of opposite sexes performing that work were paid differently.

As to the work portion of that analysis, the "focus at the prima facie stage is on actual job requirements and duties, rather than job classifications or titles."  *Vehar, supra*, at 999.

In its motion, Defendant does not dispute that Plaintiff was performing similar work but contends that she was not paid less than her male counterparts. (*See* Def.'s Br. at 10, stating that Plaintiff "cannot establish a prima facie case because she is not paid less than the most comparable male employee performing similar work under similar working conditions."). Relying on three cases from outside the Sixth Circuit, Defendant contends that "[i]n cases like this one where there is more than one employee in comparable positions, the proper test is

14

whether the plaintiff is receiving lower wages than the average of wages paid to all employees of the opposite sex performing substantially equal work and similarly situated with respect to any other factors, such as seniority, that affect the wage scale." (Def.'s Br. at 11).

Defendant relies on *Hein v. Oregon College of Educ.*, 718 F.2d 910, 916 (9th Cir. 1983); *Heymann v. Tetra Plastics Corp.*, 640 F.2d 115, 122 (8th Cir. 1981); and *Melanson v. Rantoul*, 536 F.Supp. 271, 291 (D. R.I. 1982). Defendant asserts:

> The "average" required by *Hein* is easy to calculate here – there is only one employee similar to Plaintiff, taking into account factors such as seniority. H moved into an "upper level" position a year before Morrow, but was paid $17 an hour – less than the wage being earned by Morrow for performing the same work. Ex. 24, Employee H Wage History. The two employees Morrow relies upon are not comparable. They moved into the higher wage-paying upper level positions in 1994 and 1998 respectively. Ex. 25, Employee A Wage History; Ex. 26, Employee B Wage History.
>
> Morrow cannot cherry pick an employee who has the same classification as she does without taking into account seniority in position. When that factor is taken into account, Morrow is being paid *more* than the most directly comparable employee and her prima facie case fails.

(Def.'s Br. at 11) (emphasis in original).

In response to this argument, Plaintiff's brief does not address Defendant's "cherry-picking" argument or its reliance on *Hein*, *Heymann*, or *Melanson*. Plaintiff's brief states, in its entirety:

> Plaintiff, a woman, received unequal wages compared to at least two male co-employees working the same job for Defendant Employer. See Def's Ex. 24 (our Ex. 29); Ex. 2, Morrow dep., pp. 89-90, 124-125. *Corning Glass Works, v. Brennan*, 417 U.S. 188 (1974). Thus, Plaintiff has presented a prima facie case. 29 USC §206(d).

(Pl.'s Br. at 15-16).

In *Hein*, the Ninth Circuit addressed Defendant's "cherry-picking" argument (i.e., that

15

when you have multiple employees performing the same job, an EPA plaintiff cannot just

compare himself or herself to one specific employee earning more; rather, you look to the

average wages of similarly-situated opposite sex employees performing the same job.).  In *Hein*,

the court explained:

> We do not believe that the Equal Pay Act is subject to such manipulation.
> The Act does not prohibit variations in wages; it prohibits discriminatory
> variations in wages.  If it should turn out that Dr. Campbell earns more than males
> performing substantially equal work, it is axiomatic that the Equal Pay Act does
> not afford her relief.  We thus agree with the Eighth Circuit that "a comparison to
> a specifically chosen employee should be scrutinized closely to determine its
> usefulness."  *Heymann v. Tetra Plastics Corp*., 640 F.2d 115, 122 (8th Cir. 1981).
> There were 13 men teaching at the Physical Education Department at the time of
> suit, yet the plaintiffs here, as in Heymann, chose a single employee for
> comparison apparently because he was the highest paid employee performing
> substantially equal work, not because he was the only comparable employee.
> We believe that the proper test for establishing a prima facie case in a
> professional setting such as that of a college is *whether the plaintiff is receiving
> lower wages than the average of wages paid to all employees of the opposite sex
> performing substantially equal work and similarly situated with respect to any
> other factors, such as seniority, that affect the wage scale*. See *Heymann,* 640
> F.2d at 122, *Melanson v. Rantoul*, 536 F.Supp. 271, 291 (D.R.I. 1982).  This
> recognizes that in a professional setting, wage variations may stem from a
> multitude of factors that do not implicate sex discrimination.  This conclusion is
> also in harmony with the language of the Equal Pay Act, which requires
> comparison to "employees" of the opposite sex.  The Act speaks of employees
> only in the plural.

*Hein*, 718 F.2d at 916 (emphasis added).

In *Heymann*, the Eighth Circuit addressed this same issue and noted the "self-serving

nature" of a plaintiff's comparison of his or her own wages with the wages of just one employee

performing the same job.  Like the Ninth Circuit in *Hein*, it concluded that an appropriate

comparison for a prima facie case is to compare the plaintiff's wages to the average wages of all

employees of the opposite sex performing substantially similar work.  *Heymann*, 640 F.2d at

16

121-22.  It concluded that the "average wage reflects a consideration of factors such as experience and job performance, and absent special circumstances provides a more reliable basis for comparison."  *Id*. at 122.

If this Court were to apply the *Hein/Heymann* test for a prima facie case, then Plaintiff would likely be unable to establish a prima facie case.  As Defense Counsel acknowledged at oral argument, however, the Sixth Circuit has not adopted such a test relating to a prima facie case under the EPA.  This Court will therefore not apply the *Hein/Heymann* test in determining whether Plaintiff has established a prima facie case.

The Court concludes that Plaintiff has established a prima facie case under the governing law because she has identified a male performing the same work that was paid more than her. The Court must then consider affirmative defenses.

### B. Has Defendant Established The Affirmative Defense Of Seniority So Clearly That No Reasonable Jury Could Find Otherwise?

Defendant contends that even if Plaintiff could establish a prima facie case with respect to one or more of the males employed in the Twin Screw Support Position, it would still be entitled to summary judgment because the record evidence indicates that those males were paid more as a result of seniority – not gender.

"Once a plaintiff establishes a prima facie case, the defendant must 'prove' that the wage differential is justified under one of the four affirmative defenses set forth under § 206(d)(1) of the Equal Pay Act: (1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) any other factor other than sex."  *Buntin*, 134 F.3d at 799.  "Because these nongender-based explanations for the wage differential are

17

affirmative defenses, the defendant bears the burden of proof." *Id.* This is in contrast to the burden-shifting approach in Title VII cases. *Buntin*, 134 F.3d at 799 n.6.

This means that in order to survive a defendant's motion seeking judgment as a matter of law, an "EPA plaintiff need not set forth evidence from which a jury could infer that the employer's proffered reason for the wage differential is pretextual." *Buntin,* 134 F.3d at 799. "As the party who bears the burden of persuasion, the defendant who make a motion under Rule 50(a) must demonstrate that there is no genuine issue as to whether the difference in pay is due to a factor other than sex." *Id.* In other words, granting judgment in favor of the defendant employer is "proper 'only if the record shows that they established the defense so clearly that no rational jury could have found to the contrary.'" *Id.* (citing *EEOC v. State of Delaware Dep't of Health and Soc. Servs.,* 865 F.2d 1408, 1414 (3d Cir. 1989)).

Defendant contends that the employees to whom Plaintiff wishes to compare herself with worked in upper level positions for several years before Plaintiff did so, and therefore, those employees earned both merit and COLA increases that caused the wage disparity. Thus, Defendant asserts that those male employees were paid more as a result of seniority – not gender.

In Defendant's brief, it notes that during discovery Plaintiff "suggested that L & L's failure to promote her to an upper level position prior to 2005 was, in itself, a discriminatory act, and that the wage differential she suffered as a result of her late entry into those higher paid positions is actionable." (Def.'s Br. at 14 n.7.) Defendant asserts that any such failure to promote claim, which was neither plead nor the basis for any EEOC charge, is time-barred. (*Id.*).

In response, Plaintiff does not dispute that the males to whom she wishes to compare

herself with were employed in upper level positions for years before she was and, as a result, they earned merit increases in addition to COLA increases (i.e., that any wage disparity is caused by the male employees having greater seniority in the upper level Twin Screw Support Position). But Plaintiff asserts that the "very 'root' or genesis" of the wage disparity is that "Plaintiff was denied a promotion to the upper level position held by the men for twelve years." (Pl.'s Br. at 16; *see also* Pl.'s Ex. 29). Thus, Plaintiff raises the argument that Defendant discussed in footnote 7 on page 14 of its brief. In response to that footnote, Plaintiff asserts that her claim is not time-barred and makes a general reference to the Ledbetter Fair Pay Act – without explaining how she believes it applies and makes her claim timely. (Pl.'s Br. at 17).

Defendant's Reply Brief discusses this issue also. (*See* Def.'s Br. at 1-2). Defendant contends that Plaintiff's reference to the Lilly Ledbetter Fair Pay Act "does not save her claim. Claims for discrete allegedly discriminatory acts, such as a failure to promote, must still be brought within the limitations period provided under Title VII. An employee cannot sit on his or her rights for decade, then resurrect clearly stale claims based on alleged effect that a long-ago denied promotion may currently have upon their compensation." (*Id*. at 1). Defendant contends that numerous courts, including the Eastern District of Michigan, "faced with precisely this issue have dismissed discrimination claims premised on this strained reading of the Fair Pay Act." (*Id*.). Defendant directs the Court to *Schuler v. PricewaterhouseCoopers, LLP*, 595 F.3d 370, 374-75 (D.C. Cir. 2010); *Robison v. AAA Michigan*, 2011 WL 2271296 (E.D. Mich. Judge Cohn 2011) (attached as Ex. 1 to Def.'s Reply Brief); and *Mallison v. Hawarth, Inc.*, 2011 WL 130246 (W.D. Mich. 2011).

This Court agrees with Defendant that Plaintiff cannot avoid summary judgment on her

wage claims by asserting that Defendant should have promoted her prior to 2005. The Lilly Ledbetter Fair Pay Act ("LLA") "enables plaintiffs to recover 'backpay for up to two years preceding the filing of the charge, where the unlawful employment practices that have occurred during the charge filing period are similar or related to unlawful employment practices with regard to discrimination in compensation that occurred outside the time for filing a charge.*" Mallison*, *supra* at *4 (citing 42 U.S.C. 2000e–5(e)(3)(B)). The LLA does not exempt a plaintiff from pursuing claims upon discrete acts other than pay, such as an alleged failure to promote based on gender. *See Robison, supra* ("Here, the audit and evaluation on which [Plaintiff] relies in part to support her claim are discrete discriminatory acts which resulted in a pay decrease as opposed to discriminatory compensation acts, i.e., an unlawful pay scheme, covered under the Fair Pay Act" and therefore, "the audit and evaluation acts continue to be time-barred, notwithstanding the Fair Pay Act."); *see also Schuler, ,*595 F.3d at 374-75 ("the decision whether to promote an employee to a higher paying position is not a 'compensation decision or other practice' within the meaning of that phrase in the LLA.").

Accordingly, the Court shall grant summary judgment in favor of Defendant with respect to Plaintiff's Equal Pay Act claims (Count III of Plaintiff's Complaint).

III.    **Should Any Title VII Claim Based On Unequal Wages Fails For The Same Reasons**?

Defendant's brief asserts that any Title VII claim regarding unequal wages fails for the same reason as Plaintiff's Equal Pay Act claims. (Def.'s Br. at 14). Defendant states that the "standards of liability for the two statutes are similar enough that they can be analyzed together.

*See Clark v. Johnson and Higgins*, 1999 WL 357804 (6th Cir. 1999) at *3 ("the standards of liability under the two statutes are sufficiently similar that the disposition with respect to the two claims should be the same."); and *Korte v. Diemer*, 909 F.2d 954, 959 (6th Cir. 1990). Because the EPA claims fail, the Title VII claim alleging unequal pay also fails." (Def.'s Br. at 14).

Plaintiff did not responded to this argument.

The authority that Defendant relies on supports its position. If the Court dismisses Plaintiff's EPA claims, then the Court would typically also dismiss any Title VII claims based on alleged unequal pay.

There is, however, a wrinkle because Plaintiff is pursuing a "mixed motive" case under Title VII. As discussed below, mixed-motive claims do not follow the *McDonnell Douglas* burden shifting framework and, as a result, it is more difficult for a Defendant to obtain summary judgment as to such claims. But, as explained above, the second portion of the *McDonnell Douglas* burden shifting framework does not apply to EPA claims either. That is, a Defendant has a higher burden for obtaining summary judgment once a plaintiff has established a prima facie EPA claim because it has to establish the affirmative defense so clearly that no reasonable jury could find otherwise. The standards that apply to the two claims are ultimately, therefore, very similar. This Court concludes that Defendant is entitled to summary judgment with respect to Plaintiff's EPA claim because Defendant has established the affirmative defense so clearly that no reasonably jury could find otherwise. The Court shall therefore also grant summary judgment in favor of Defendant as to Plaintiff's Title VII claim based on alleged unequal wages.

## IV.    Plaintiff's Title VII Claims

Plaintiff's Complaint also asserts gender discrimination claims under Title VII (Count I)

and retaliation claims under Title VII (Count II).

As an initial matter, the Court must determine the proper analytical framework to apply to Plaintiff's Title VII claims at the summary judgment stage of this case.

Allegations of discriminatory conduct "fall into one of two categories: single-motive claims, 'where an illegitimate reason motivated an employment decision,' or mixed-motive claims, 'where both legitimate and illegitimate reasons motivated the employer's decision.'" *Spees v. James Marine, Inc.*, 617 F.3d 380, 389-90 (6th Cir. 2010) (quoting *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 396 (6th Cir. 2008)).

Defendant's Motion for Summary Judgment challenges Plaintiff's Title VII gender discrimination and retaliation claims by asserting that she cannot survive summary judgment under the *McDonnell Douglas* burden-shifting framework.

Plaintiff's brief, however, affirmatively states that she is asserting a "mixed motive" case under Title VII. (Pl.'s Br. at 6, stating "we clearly have a 'mixed motive' case under Title VII"; *see also* Pl.'s Br. at 7, stating this is "a mixed motive case that must be submitted to the jury.")

The Sixth Circuit has held that a plaintiff may sufficiently notify a defendant that it intends to pursue a mixed motive case by stating so in his or her brief in response to a motion seeking summary judgment. *See, e.g. Spees,* 617 F.3d at 390; *Ondricko v. MGM Grand Detroit, LLC,* 689 F.3d 642, 649-50 (6th Cir. 2012). "Therefore, [Plaintiff] is entitled to a mixed-motive analysis of her Title VII claims." *Id.*

### A.    Standard Applicable To Mixed-Motive Cases At Summary Judgment Stage

In *White*, the Sixth Circuit held that the *McDonnell Douglas* burden shifting framework *does not* apply to mixed-motive Title VI claims. *White*, 533 F.3d at 400. Instead, a plaintiff

22

asserting a Title VII mixed-motive claim need only present evidence sufficient to convince a jury that: 1) the defendant took an adverse employment action against the plaintiff; and 2) a protected characteristic was "a motivating factor" for that action, even if other permissible factors also motivated the decision. *White*, 533 F.3d at 400-402. "In order to reach a jury, the plaintiff is not required to eliminate or rebut all the possible legitimate motivations of the defendant as long as the plaintiff can demonstrate that an illegitimate discriminatory animus factored into the defendant's decision to take the adverse employment action." *White*, 533 F.3d at 401. The ultimate question at the summary judgment stage is where there are any genuine issues of material fact concerning the defendant's motivation for its adverse employment decision. *Id.* at 402.

The Sixth Circuit has explained that "[a]s '[i]nquiries regarding what actually motivated an employer's decision are very fact intensive,' such issues 'will generally be difficult to determine at the summary judgment stage' and thus will typically require sending the case to the jury." *White*, 533 F.3d at 402 (citations omitted). The Sixth Circuit has described a plaintiff's burden of production at the summary judgment stage of a mixed-motive case as "minimal." *Id.* It has further held that "[t]his burden of producing some evidence in support of a mixed-motive claim is not onerous and should preclude sending the case to the jury only where the record is devoid of evidence that could reasonably be construed to support the plaintiff's claim." *Id.* at 400.[2]

---

[2]The "relatively lenient summary judgment standard" that applies to mixed-motive cases "is counterbalanced by potential restrictions on a plaintiff's recovery for a mixed-motive claim. Under Title VII, a plaintiff asserting a mixed-motive claim is entitled only to declaratory relief, limited injunctive relief, and attorney fees and costs where the employer demonstrates that it would have taken the same employment action in the absence of an impermissible motivating

In *White*, the Sixth Circuit explained that although *McDonnell Douglas* burden shifting framework does not apply to mixed-motive claims, a plaintiff asserting a mixed-motive Title VII claim may nevertheless find parts of that framework useful in demonstrating that his or her case should be submitted to a jury.  *White*, 533 F.3d at 401.  That is, setting forth a prima facie case under that framework can aid the plaintiff in showing that an illegal reason motivated the adverse action.  In addition, in assessing whether an employee has demonstrated that an illegal reason was a motivating factor in the employer's adverse action, the court should also consider evidence presented by the employer that the protected characteristic was not a motivating factor for its employment decision.  *Id.*

**B**.       **Plaintiff's Retaliation Claims**

To state a prima facie case of retaliation under Title VII, a plaintiff must establish: 1) she engaged in activity protected by Title VII; 2) the exercise of her civil rights was known by the defendant; 3) thereafter, the defendant took an employment action adverse to the plaintiff; and 4) there was a causal connection between the protected activity and the adverse employment action.  *Warf, supra*, at * 4.

Here, there is no dispute that Plaintiff engaged in activity protected by Title VII and that the exercise of Plaintiff's civil rights was known by L & L.  It is also undisputed that L & L took two different adverse actions as to Plaintiff: 1) suspending her following the June 6, 2011, incident; and 2) discharging her effective July 1, 2011, when she failed to submit an amended commitment letter.  In its motion, Defendant only challenges the fourth element – whether

---

factor.  42 U.S.C. §2000e–5(g)(2)(B)."  *Spees*, 617 F.3d at 390.

Plaintiff could establish a causal connection.

Viewing the evidence submitted by Plaintiff in the light most favorable to her, Plaintiff has presented evidence that a female employee who had not filed any charges of discrimination against L & L, Hurst, engaged in conduct that constitutes a safety violation. Yet Hurst was not suspended following that safety violation, nor was she required to submit a commitment letter following that incident in order to continue her employment. The Court finds that may be sufficient evidence to create an issue of fact as to the casual connection that would be required for a prima facie case. And, of course, Plaintiff is not required to establish a prima facie case in order to survive summary judgment. Accordingly, this is not a situation where "the record is devoid of evidence that could reasonably be construed to support the plaintiff's claim." *White, supra,* at 400.

### C.      Plaintiff's Gender Discrimination Claims

To state a prima facie case of disparate-treatment based on gender, a plaintiff must establish:  1) membership in the protected class (female in this case); 2) that she suffered an adverse action; 3) that she was qualified for the position; and 4) that she was treated differently from similarly situated members of the unprotected class (male in this case). *Chattman v. Toho Tenax Amercia, Inc*., 686 F.3d 339, 347 (6th Cir. 2012).

Here, Plaintiff is in the protected class of female. Defendant does not dispute that Plaintiff, who was employed by Defendant for many years, was qualified for the position she held. It is also undisputed that L & L took two different adverse actions as to Plaintiff: 1) suspending her following the June 6, 2011, incident; and 2) discharging her effective July 1, 2011, when she failed to submit an amended commitment letter. In its motion, Defendant only

25

challenges the fourth element – whether Plaintiff could establish that she was treated differently than similarly situated members of the unprotected class (males).

Viewing the evidence submitted by Plaintiff in the light most favorable to her, Plaintiff has presented evidence that a male employee, Nellenbach, was involved in the June 6, 2011, incident.  She has also submitted evidence that, when viewed in the light most favorable to her, establishes that:  1) L & L representative Balsam saw that both Plaintiff and Nellenbach were involved in the June 6, 2011, incident; 2) Balsam verbally advised both Plaintiff and Nellenbach that they acted in an unsafe manner; and 3) Balsam then reported Plaintiff's conduct to VanConant and Hurd, without reporting Nellenbach's involvement.  Thus, a non-protected employee was involved in the incident at issue, but was neither suspended nor required to submit a commitment letter in order to continue his employment with L & L.

The Court finds that is sufficient evidence to create an issue of fact as to whether Plaintiff was treated differently than a similarly-situated non-protected employee. As is the case with Plaintiff's retaliation claims, this not a situation where "the record is devoid of evidence that could reasonably be construed to support the plaintiff's claim." *White, supra,* at 400.

This Court shall therefore deny Defendant's Motion for Summary Judgment as to Plaintiff's Title VII retaliation and gender discrimination claims.

## CONCLUSION & ORDER

For the reasons set forth above, IT IS ORDERED that Defendant's Motion for Summary Judgment is GRANTED IN PART AND DENIED IN PART.

The motion is GRANTED to the extent that the Court shall dismiss Plaintiff's Equal Pay

26

Act claims and Plaintiff's Title VII claims based on alleged unequal wages.

The motion is DENIED as to Plaintiff's remaining Title VII retaliation and gender discrimination claims, which are based upon her suspension and termination.

IT IS SO ORDERED.

S/Sean F. Cox
Sean F. Cox
United States District Judge

Dated:  May 14, 2013

I hereby certify that a copy of the foregoing document was served upon counsel of record on May 14, 2013, by electronic and/or ordinary mail.

S/Jennifer McCoy
Case Manager